# Supreme Court of Florida

_____

No. SC19-2016

_____

**ALACHUA COUNTY, FLORIDA, etc.,**
Petitioner,

vs.

**CLOVIS WATSON, JR., etc.,**[1]
Respondent.

January 27, 2022

COURIEL, J.

In this case, we decide how two statutes divide between a county and its sheriff the power to make changes to the sheriff's budget. Specifically, the parties ask us to determine a sheriff's authority to transfer money within the sheriff's budget at a certain level of detail—what is called the "object" level—under chapters 30 and 129, Florida Statutes (2020). After the Sheriff of Alachua County (Sheriff) moved approximately $840,000 between two

_____

1. While this matter was pending, Sadie Darnell was replaced as Sheriff of Alachua County by Clovis Watson, Jr., who is substituted for her as Respondent.

objects in the budget without approval from Alachua County's Board of Commissioners (County) in 2016, the County sought declaratory judgment that the Sheriff had no authority to do so.

We have jurisdiction because the decision of the First District Court of Appeal expressly affects a class of constitutional or state officers (really two classes, sheriffs and county commissioners). Art. V, § 3(b)(3), Fla. Const. We conclude that when seeking to transfer money between objects, the Sheriff must follow the budgetary amendment process established by the Legislature in chapter 129, and that the Sheriff failed to do so here. The existence of a detailed process for the review and approval of funding decisions at the object level, reflected in the plain, whole text of the statute, means that the Legislature decided the Sheriff must obtain the County's approval before amending those appropriations that the County had previously fixed and approved from the funds it had collected.

**I**

Chapter 30, Florida Statutes (2020), specifically addresses the sheriffs' offices, and chapter 129 concerns the counties' annual

budgets.  The budgeting sections of chapter 30 explicitly refer to and incorporate portions of chapter 129.[2]  We start there.

## A

In Florida, we have long had a "budget system for the control of the finances of the boards of county commissioners of the several counties of the state."  § 129.01, Fla. Stat. (2020); *see also Consol. Naval Stores Co. v. Hendry*, 30 So. 2d 617, 619 (Fla. 1947) ("The purpose and policy of budgeting is to inoculate the administration of national, state and local government with some degree of system and business order; to put an end to blind spending; to get away from anything that savors of a spendthrift policy, and reduce income and outgo to a common level.").  That means, each year, a budget "must be prepared, summarized, and approved by the board of county commissioners of each county."  § 129.01(2)(a), Fla. Stat. (2020).  Each county's budget "must be balanced, so that the total

---

2.  *See, e.g.*, § 30.49(1), Fla Stat. (2020) ("Pursuant to s. 129.03(2), each sheriff shall annually prepare and submit to the board of county commissioners a proposed budget . . . ."); § 30.50(4) (" [T]he budget may be amended as provided for county budgets in s. 129.06(2)."); § 30.49(8) ("[Budget items] shall be subject to the same provisions of law as the county annual budget . . . .").  (Chapter 129 is entitled "County Annual Budget.")

of the estimated receipts available from taxation and other sources, including balances brought forward from prior fiscal years, equals the total of appropriations for expenditures and reserves." § 129.01(2)(b).  Chapter 129 defines and limits the kinds of reserves each county can set aside for projected expenses.  § 129.01(2)(c).  It allows the county to make an appropriation for the payment of its outstanding debts.  § 129.01(2)(d).  And it sets out how and under what circumstances budget surpluses can be carried over at the end of each fiscal year.  § 129.01(2)(e).

The statute provides "specific directions and requirements" about what each county's budget must include.  § 129.02.  The county must provide "an estimate of receipts by source and balances" for its general fund budget, the County Transportation Trust Fund budget, the budget for the county's fine and forfeiture fund, and its capital outlay reserve fund budget.  § 129.02(1)-(4). The budget for the county's fine and forfeiture fund in particular must contain "an itemized estimate of expenditures that need to be incurred to carry on all criminal prosecution, and all other law enforcement functions and activities of the county."  § 129.02(3).

"For each special district[3] included within the county budget, the budget must show budgeted revenues and expenditures by organizational unit which are at least at the level of detail required for the annual financial report" that Florida law requires of local government entities. § 129.02(6) (citing § 218.32(1), Fla. Sta. (2020)).

Having set what must be included in a budget, chapter 129 then requires that "the budgets of all county officers, as submitted to the board of county commissioners, must be in sufficient detail and contain such information as the board of county commissioners may require in furtherance of their powers and responsibilities provided in ss. 125.01(1)(q), (r), and (v), and (6) and 129.01(2)(b)." § 129.021. Those provisions, in summary, refer to a county's taxing power, its power to require every county official to submit an annual operating budget, and the county's responsibility to balance its budget.

---

3. A special district is "a unit of local government created for a special purpose, as opposed to a general purpose, which has jurisdiction to operate within a limited geographic boundary and is created by general law, special act, local ordinance, or by rule of the Governor and Cabinet." § 189.012(6), Fla. Stat. (2020).

Using all this information, each county prepares and formally adopts a budget every year.  Relevant to our case, a sheriff, like the clerk of the circuit court, county comptroller, certain tax collectors, and the county supervisor of elections, "shall," on or before June 1 of each year (or a month earlier, if the county says so), "submit to the board of county commissioners a tentative budget for [the sheriff's] office[] for the ensuing fiscal year."  § 129.03(2).  Then, the board of county commissioners "shall receive and examine the tentative budget for each fund"[4] and, subject to the notice and hearing requirements of the law governing how counties set millage[5] rates, "shall require such changes to be made as it deems

---

4.  In this context, a "fund" is "an independent fiscal and accounting entity consisting of a self-balancing set of accounts for recording cash and/or other assets together with related liabilities, reserves and equities segregated for the purpose of carrying on specific activities or attaining certain objectives in accordance with certain defined regulations, restrictions and limitations."  Fla. Dept. of Fin. Servs. Bureau of Fin. Reporting, *Uniform Accounting System Manual for Florida Local Governments* (2014) (UASM) at 6.  The UASM gives examples of fund categories, including "General Fund," "Capital Projects Funds," and "Special Revenue Funds."  *Id.*

5.  A "mill" is one one-thousandth of a dollar, or one tenth of one cent.  In the context of taxes on real estate, the "millage rate" refers to the tax assessed for each $1,000 of property value.  *See Black's Law Dictionary* 1190 (11th ed. 2019).

necessary, provided the budget remains in balance." § 129.03(3)(a). The county next "prepare[s] a statement summarizing all of the adopted tentative budgets" showing, for each and for the total of all the budgets so submitted, "the proposed tax millages, balances, reserves, and the total for each major classification of receipts and expenditures." § 129.03(3)(b). It holds public hearings to adopt tentative and final budgets, "primarily for the purpose of hearing requests and complaints from the public regarding the budgets and the proposed tax levies and for explaining the budget and any proposed or adopted amendments." § 129.03(3)(c). And, by October 15 of each year, the county submits a final budget, along with other economic data, to the Office of Economic and Demographic Research. § 129.03(3)(d).

It is unlawful for a county to exceed a budget that has been finalized this way, unless the budget is modified as provided in section 129.06, to which we will turn soon. § 129.07. But first, we catch a glimpse of some teeth in the statute and see where they are meant to bite: it is the members of the board of county commissioners who are liable for debts taken in excess of the duly approved budget. *See id.* And any member of the board who

knowingly and willfully votes to take on debt in excess of the budget "shall be guilty of malfeasance in office and subject to suspension and removal from office as now provided by law, and shall be guilty of a misdemeanor" punishable by a fine and up to six months in county jail. § 129.08. In this way, the statute gives each county, and the individual members of the board of county commissioners, an incentive to ensure that any adjustments to the budget are made a certain way—the way, that is, set out in section 129.06, the provision at the center of this case.

Section 129.06 starts from the premise that, "[u]pon the final adoption of the budgets as provided in this chapter, the budgets so adopted must regulate expenditures of the county and each special district included within the county budget, and the itemized estimates of expenditures must have the effect of fixed appropriations and may not be amended, altered, or exceeded except as provided in this chapter." § 129.06(1).

The statute lays out five ways a county may change the fixed appropriations reflected in the budget without holding a public hearing and, after such a hearing, adopting a resolution. § 129.06(2). None of those ways describes the transfer at issue here

but, in expressly delineating the circumstances to which these exceptions apply, we see in the structure of chapter 129 a bulwark against cavalier adjustments to duly enacted appropriations. No amendment happens without a public hearing and formal resolution in its favor, unless: (1) the total appropriations for the relevant fund do not change as a result of the appropriation; (2) the amendment draws from the reserve for contingencies to increase the appropriation for any particular expense in the same fund, or to create a new appropriation in the fund; (3) the amendment draws from the reserve for future construction and improvements, if for the purpose for which the reserve was made; (4) the amendment draws from a source not anticipated in the budget and received for a particular purpose (like a grant or gift);[6] or (5) the amendment

---

6. Even with found money, the county must adhere to budgeting protocol. A receipt "received for a particular purpose . . . [may] be appropriated and expended for that purpose," but "[s]uch receipts and appropriations must be added to the budget of the proper fund." § 129.06(2)(d). And, significantly for the transfer of funds we consider today—which involved not found money, but money that had previously been budgeted for another purpose—the resolution authorizing the expenditure of receipts from unexpected sources "may amend the budget to transfer revenue between funds to properly account for unanticipated revenue." *Id.*

draws from increased receipts for enterprise or proprietary funds.[7] Unless it is provided for in the budget, including by amendment in any of the ways explained above, a transfer between funds may be made only if it is to correct an error in handling receipts and disbursements, or to properly account for unanticipated revenue or increased receipts.  § 129.06(3).

The last piece of section 129.06 relevant to this case is the so-called "lame duck" provision.  It states:

> Any county constitutional officer whose budget is approved by the board of county commissioners, who has not been reelected to office or is not seeking reelection, shall be prohibited from making any budget amendments, transferring funds between itemized appropriations, or expending in a single month more than one-twelfth of any itemized approved appropriation, following the date he or she is eliminated as a candidate or October 1, whichever comes later, without approval of the board of county commissioners.

---

7.  Enterprise and proprietary funds are related to things the county provides to the public for a fee, like water and sewer utility funds.  *See UASM* at 7 ("Enterprise Funds" are created "[t]o account for operations (a) that are financed and operated in a manner similar to private business enterprises--where the intent of the governing body is that the costs (expenses, including depreciation) of providing goods or services to the general public on a continuing basis be financed or recovered primarily through user charges; or (b) where the governing body has decided that periodic determination of revenues earned, expenses incurred and/or net income is appropriate for capital maintenance, public policy, management control, accountability or other purposes.").

§ 129.06(5).  Of note, this law prohibits the constitutional officers to whom it is addressed "from making any budget amendments" along the lines outlined elsewhere in section 129.06, not just from "transferring funds between itemized appropriations."  *Id.*

**B**

Sheriffs are, in sixty-six of Florida's sixty-seven counties, duly elected constitutional officers.[8]  Chapter 30 of our statutes addresses them specifically, laying out significant powers and responsibilities, several of which are exclusive to them.  For example, each sheriff has the exclusive power to appoint deputies, so long as those candidates meet all statutory qualifications.  § 30.073(1).  Sheriffs "shall . . . [s]uppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary" and "[a]pprehend, without warrant, any person

---

8.  The temporary exception is Miami-Dade County.  In 1966, the office of sheriff was abolished in Miami-Dade County and the powers and functions of the sheriff were transferred to the mayor, who "may delegate to a suitable person or person the powers and functions" of the sheriff.  Mia.-Dade Cnty., Fla., Charter art. 9, § 9.01(C) (2021).  In 2018, voters passed Amendment 10 to the Florida Constitution which, in part, requires Miami-Dade County to hold elections for its sheriff starting in 2024.  Art. VIII, § 6(g)(2), Fla. Const.

disturbing the peace, and carry that person before the proper judicial officer, that further proceedings may be had against him or her according to law." § 30.15(f)-(g). A sheriff has "full, complete and plenary" discretion "to temporarily close any public beach, park, or other public recreation facility within the sheriff's jurisdiction when in his or her discretion conditions exist which present a clear and present or probable threat of violence, danger, or disorder, or at any time a disorderly situation exists which in the sheriff's opinion warrants such action." § 30.291.

More to the point at issue here, section 30.53, entitled "Independence of constitutional officials," addresses sheriffs' spending power:

> The independence of the sheriffs shall be preserved concerning the purchase of supplies and equipment, selection of personnel, and the hiring, firing, and setting of salaries of such personnel; provided that nothing herein contained shall restrict the establishment or operation of any civil service system or civil service board created pursuant to s. 14, Art. III, of the Constitution of Florida, provided, further that nothing contained in ss. 30.48-30.53 shall be construed to alter, modify or change in any manner any civil service system or board, state or local, now in existence or hereafter established.

§ 30.53.

And yet, chapter 30 does not give the sheriffs exclusive authority over budgetary matters, for sheriffs are subject to the provisions of chapter 129. The statute provides that "items placed in the budget of the board of county commissioners pursuant to this law" are subject to "the same provisions of law as the county annual budget." § 30.49(8). In providing a proposed annual budget to the county commission, the sheriff must categorize proposed expenditures at several levels of specificity. § 30.49(2)(a). The broadest category within the sheriff's budget is the "function" level, which includes "general law enforcement," "corrections and detention alternative facilities," and "court services, excluding service of process." § 30.49(2)(a)(1)-(3). Within each function are six "objects," which include "personnel services," "operating expenses," "capital outlay," "debt service," "grants and aids," and "other uses." § 30.49(2)(c)(1)-(6). At the request of the county, the sheriff must also break down expenses at the more granular "subobject" level. § 30.49(3). The subobject level includes items such as executive salaries, court reporter services, utility services, office supplies, and interest on debt. Fla. Dept. of Fin. Servs.

- 13 -

Bureau of Fin. Reporting, *Uniform Accounting System Manual for Florida Local Governments* 132-141 (2014) (UASM).[9]

The county "may not amend, modify, increase, or reduce any expenditure at the subobject code level" or "require confidential information concerning details of investigations" as part of its budgetary oversight of the sheriff's operations. § 30.49(3). It may, however, "require the sheriff to correct mathematical, mechanical, factual, and clerical errors and errors as to form in the proposed budget" (without regard to the level of specificity) and, after a hearing, "amend, modify, increase, or reduce any or all items of expenditure in the proposed budget . . . and shall approve such budget, as amended, modified, increased, or reduced." § 30.49(4). After approving the budget, the county must notify the sheriff in writing of the approved budget and include "the specific items amended, modified, increased, or reduced." § 30.49(4), Fla. Stat. (2020).

---

9. The statute uses terms defined by the UASM. § 30.49(2)(c) ("[E]xpenditures must be itemized in accordance with the uniform accounting system prescribed by the Department of Financial Services."). This includes functions, objects, and subobjects.

As the parties did in their briefs, we refer to the version of the UASM that was in effect when this dispute arose.

In our case, the parties do not dispute that the Sheriff must follow the steps set out at section 30.49. They agree the Sheriff's proposed budget must include estimated amounts for "all proposed expenditures for operating and equipping the sheriff's office and jail, excluding the cost of construction, repair, or capital improvement of county buildings during the fiscal year." § 30.49(2)(a). Nor do the parties dispute certain limits to the County's budgeting authority. For example, while the County may reduce the amount of money allocated to personnel services (an object), it may not shift money from the Sheriff's salary to the salaries of deputies (subobjects).[10]

One last element of chapter 30 is relevant to this case: it lays out a process for appealing budgetary disagreements. If a sheriff wants to appeal the county's decision on a budgetary matter, he or she must file an appeal to the Administration Commission

---

10. The Sheriff has not argued that the transfer of funds at issue was required by an emergency. Chapter 30 speaks to those, too. "If in the judgment of the sheriff an emergency should arise by reason of which the sheriff would be unable to perform his or her duties without the expenditure of larger amounts than those provided in the budget, he or she may apply to the board of county commissioners for the appropriation of additional amounts." § 30.49(10). The sheriff gets to appeal the county's decision if it is unsatisfactory.

(Commission) within 30 days of the board's approval. § 30.49(4)(a), Fla. Stat. (2020). The Executive Office of the Governor (Executive Office) must hold a hearing for each party to make its case. § 30.49(5), Fla. Stat. (2020). The Executive Office must submit a report of the hearing to the Commission, which then approves, amends, or modifies the sheriff's budget "as to each separate item." *Id.* The Commission's decision is final. *Id.*

## C

The parties do not dispute the facts that brought them here. In 2016, the Sheriff moved about $840,000 between objects without the County's approval. Some $700,000 of that money was transferred from jail personnel expenditures to the Sheriff's operating expenses and capital outlay. The County sued for a declaratory judgment that the Sheriff lacked authority to transfer appropriated funds within the Sheriff's budget at the object level— that is, between "personnel services," "operating expenses," "capital outlay," "debt service," "grants and aids," and "other uses"—or at the function level—that is, between "general law enforcement," "corrections and detention alternative facilities," and "court services, excluding service of process"—without County approval.

The trial court found that it lacked jurisdiction on the issue of function transfers, the Sheriff having made none of those. But after a bench trial, the court concluded that the Sheriff had the authority to make transfers at the object level without County approval. *Alachua Cnty., Fla. v. Darnell,* No. 01-2017-CA-521, 2018 WL 11189988, at *1 (Fla. 8th Cir. Ct. Jan. 5, 2018).

The First District agreed. Its decision rested on three points: section 30.53 preserves sheriffs' independence; the "lame duck" provision of section 129.06(5) specifies the only situation where the sheriff needs board approval for a transfer; and *Weitzenfeld v. Dierks*, 312 So. 2d 194 (Fla. 1975), is controlling and affirms the Sheriff's budgetary independence.

**II**

Since the merits of this case only concern statutory interpretation, our review is de novo. *GTC, Inc. v. Edgar*, 967 So. 2d 781, 785 (Fla. 2007). The "plain meaning of the statute is always the starting point in statutory interpretation." *Id.* As the Supreme Court of the United States recently explained,

> [w]hen called on to resolve a dispute over a statute's meaning, [we] normally seek[] to afford the law's terms their ordinary meaning at the time [the legislature]

- 17 -

adopted them.  The people who come before us are entitled, as well, to have independent judges exhaust "all the textual and structural clues" bearing on that meaning.  When exhausting those clues enables us to resolve the interpretive question put to us, our "sole function" is to apply the law as we find it.

*Niz-Chavez v. Garland,* 141 S. Ct. 1474, 1480 (2021) (internal citations omitted) (quoting *Wisconsin Central Ltd. v. United States,* 138 S. Ct. 2067, 2074 (2018), and *Lamie v. U.S. Trustee,* 540 U.S. 526, 534 (2004)).  Here, on balance, the textual and structural clues tell us that the County has the correct reading of the statutes at issue.

## A

As is often the case, each party before us can marshal a piece of the statutory text at issue to support its position.  But we consider chapters 129 and 30 in concert to ascertain the plain meaning of the specific provisions on which this dispute turns.  *See K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").  It is the statutes we have set forth in our discussion above, and how as integrated

- 18 -

bodies of law they fit together, that resolve this case. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

Structurally, chapters 30 and 129 are built around the fact that, as to the money relevant to this dispute, the County is the relevant taxing authority. *See generally* art. VII, § 9, Fla. Const. That is, the Sheriff's operations are funded in substantial part by taxes collected by the County, and the legislatively crafted interaction between chapters 129 and 30 makes sense when we start from the proposition that it is the taxpayers' money, as collected by the County, that the Sheriff is spending each year. It is for this reason that "[a]ll fees, commissions, or other funds collected by the sheriff for services rendered or performed by his or her office shall be remitted monthly to the county." § 30.51(5). It is also why "the budgets of all county officers, as submitted to the board of county commissioners, must be in sufficient detail and contain

such information as the board of county commissioners may require." § 129.021. The County must balance its budget, and it must include submissions from the Sheriff on a statutorily prescribed schedule. *See* § 120.03(3)(a). It is the County's responsibility to hold public hearings to review and adopt the budget, § 129.03(3)(c), and it is the county commissioners who are statutorily liable for debts incurred in excess of the duly approved budget. § 120.07.

This financial relationship, carefully laid out in the statutes, is not in derogation of the Sheriff's constitutional independence, which the plain words selected by the Legislature also preserve. *See* § 30.53. Yet the Sheriff's independence as a constitutional officer does not answer the question before us, for county commissioners, too, are duly elected constitutional officers, and neither party's status as such tells us at what level of budgetary detail one is free to act without the consent of the other. *See Pinellas Cnty. v. Nelson*, 362 So. 2d 279, 281 (Fla. 1978) (Hatchett, J.) ("Chapter 129 expressly imposes upon the Board of County Commissioners the duty and responsibility to oversee the budgets of all departments, agencies, and offices coming under its control

for budget purposes.").  The Sheriff's spending authority, as given specific force in section 30.53, is authority to make funding decisions about matters that, in budgetary parlance, are subobjects:  "the purchase of supplies and equipment, selection of personnel, and the hiring, firing, and setting of salaries of such personnel."  § 30.53; *see also* UASM at 131-141.[11]

Another structural clue appears in section 30.49.  That provision requires the sheriff to itemize *proposed* budget expenditures into categories that correspond to the fund and object level: general law enforcement, corrections and detention alternative facilities, and court services, excluding service of process.  *See* § 30.49(2)(a); UASM at 103 (521.00 Law Enforcement; 523.00 Detention and Correction).  In its very next subsection, the statute requires the sheriff to provide *historical* budget expenditures for

---

11.  UASM at 132 (indicating which codes are object codes and subobject codes); *id.* at 133 (subobject codes 11-15 correspond to salaries); *id.* at 135 (subobject codes 31-34 correspond to other types of personnel, e.g., accountants or janitorial); *id.* at 136-37 (subobject codes 42, 47, 51, 52, 53, and 54 correspond to various supplies, e.g., office supplies or food); *id.* at 137 (subobject code 55 corresponds to training); *id.* at 138 (subobject code 64 corresponds to "machinery and equipment").

previous fiscal years down to the subobject level. It then provides that the board "may not amend, modify, increase, or reduce any expenditure at the subobject code level." § 30.49(3). A natural reading of these two immediately adjacent provisions, in a section of the code entitled "Budgets," suggests a break between objects and subobjects for budgetary purposes. The meaning of that break is spelled out in the plain language of the statute, which reflects a legislative choice to restrict the board's action at the subobject level, while requiring the sheriff to provide prospective information about projected object-level—but not subobject-level—expenditures.

It is, in other words, a specific degree of budgetary independence that the Legislature has afforded the Sheriff. While section 30.53 states that "[t]he independence of the sheriffs shall be preserved concerning the purchase of supplies and equipment, selection of personnel, and the hiring, firing, and setting of salaries of such personnel," it does not exempt sheriffs from the provisions of section 129 altogether, although it of course might have. We therefore read section 30.53 in harmony with its neighboring provisions, and with chapter 129, the purposeful and precise choices of which would have little force if we understood those

- 22 -

provisions to give the Sheriff the budgetary authority he claims here. *See Busby v. State*, 894 So. 2d 88, 100 (Fla. 2004) (rejecting an interpretation that would "directly undercut this Court's charge of interpreting statutes as a harmonious whole, giving effect to each of their constituent parts"); Scalia & Garner, *supra*, at 180 ("The imperative of harmony among provisions is more categorical than most other canons of construction because it is invariably true that intelligent drafters do not contradict themselves (in the absence of duress). Hence there can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."). So, the Sheriff must follow the budgetary amendment process established by the Legislature when seeking to transfer money between objects in his budget.

## B

But, says the Sheriff, what about the "lame duck" provision of section 129.06(5)? In providing that "any constitutional officer . . . who has not been reelected to office or is not seeking reelection, shall be prohibited from . . . transferring funds between itemized appropriations," the statute suggests that constitutional officers who do not fall into the "lame duck" category are not so prohibited

- 23 -

from transferring funds. Citing our decision in *Moonlit Waters Apartments, Inc. v. Cauley*, 666 So. 2d 898, 900 (Fla. 1996), the First District agreed, finding that "[u]nder the principle of statutory construction, expressio unius est exclusio alterius, the prohibition cannot be read to also apply to sitting sheriffs . . . [because] 'the mention of one thing implies the exclusion of another.'" *Alachua Cnty. v. Darnell*, 301 So. 3d 1027, 1029 (Fla. 1st DCA 2019) (citation omitted) (quoting *Moonlit Waters*, 666 So. 2d at 900).

The *expressio unius* canon, also called the "negative implication" canon, does support the Sheriff's reading of section 129.06(5) if that provision is considered by itself, but—and this is the matter before us—it does not supply the meaning of that provision in the context of the whole text at issue. The Legislature did not write section 129.06(5) on a blank slate in 1988. *See* ch. 88-85, § 2, at 365, Laws of Fla. The provisions contained in sections 30.49(8) and 30.50(4) were already there, contemplating that the sheriffs would request amendments to appropriations as needed, and would apply to their respective boards of county commissioners for the appropriation of additional funds. We presume the Legislature knew about the preexisting provisions, and

that it would have expressly overruled them if such had been the legislative bargain that was to become our law. *See Palm Harbor Special Fire Control Dist. v. Kelly*, 516 So. 2d 249, 250 (Fla. 1987) ("[T]he legislature is presumed to pass subsequent enactments with full awareness of all prior enactments and an intent that they remain in force."). But it was not.

The lame duck provision occupies a statutory architecture that makes the Sheriff's proposed reading of it untenable. "Virtually all the authorities who discuss the negative-implication canon emphasize that it must be applied with great caution, since its application depends so much on context. . . . The doctrine properly applies only when the *unius* (or technically, *unum*, the thing specified) can reasonably be thought of as an expression of *all* that shares in the grant or the prohibition involved." Scalia & Garner, *supra*, at 107. Here, at length and in detail, the statutes at issue tell us the lame duck provision is not an expression of all the sheriff's authority, or all the county's authority, that is at stake in the process of setting and amending budgets. It is instead an expression of the authority granted to (or a prohibition imposed upon) a sheriff in a limited circumstance: when he or she "has not

been reelected to office or is not seeking reelection . . . following the date he or she is eliminated as a candidate or October 1, whichever comes later." § 129.06(5).

Reading the lame duck provision to limit specifically the budget-amending authority *only* of lame duck sheriffs spares much of the rest of chapter 129 from obsolescence. For example, reading it the way the County does makes sense of the public hearings called for by section 129.03(3)(c), the work of which could otherwise be tossed aside by the sheriff if his or her unilateral amendment authority extended to object-level transfers. Similarly, the statute's procedures for modulating appropriations in emergency circumstances would be of no use if the Sheriff had the authority he purports to have under the lame duck provision. Nor would some parts of chapter 30 be spared from obsolescence were the Sheriff correct: there would be little need for recourse to the Administration Commission as contemplated in section 30.49(4) and (5) if the Sheriff were free to make transfers at the object level after they had become fixed appropriations. It is better, and indeed our role, to read these provisions so that they do not undo each

other, as each reflects a purposeful legislative choice that makes sense in the context of its neighbors.

## C

Our decision today does not overrule *Weitzenfeld v. Dierks*, 312 So. 2d 194 (Fla. 1975). In that case, we considered whether the Department of Administration's[12] ability to modify a county's changes to a sheriff's budget under a prior version[13] of section

---

12. Established by the Legislature in 1969, the Department of Administration was a state agency responsible for overseeing planning and budgets. Ch. 69-106, § 31, at 552, Laws of Fla. The Department of Administration was abolished in 1992, and most of its responsibilities were transferred to the newly created Department of Management Services. When *Weitzenfeld* was decided, section 30.49 stated that the Department supervised review of county modifications to sheriffs' budgets. § 30.49(5), Fla. Stat. (1973). Under the current statutory scheme, the review process is overseen by the Administration Commission and the Executive Office. § 30.49(5), Fla. Stat. (2021). This process is not in play here, because the County did not make any changes or deletions to the Sheriff's proposed budget, and therefore the matter was not presented to the Administration Commission and Executive Office.

13. Since 1975, section 30.49 has been revised on several occasions, most notably in 2002 and 2011. Ch. 2002-193, § 2, Laws of Fla.; ch. 2011-144, § 2, Laws of Fla. In 2002, the Legislature overhauled the required format of sheriffs' budgets. Instead of six narrow categories of expenditure, sheriffs were thereafter required to organize their budgets into three broad functional categories, organized by object code. Ch. 2002-193, § 2.

30.49 was "an unconstitutional attempt to vest in an appointive official unrestricted discretion." 312 So. 2d at 195. That prior version of the statute required the sheriffs to sort their proposed budgets into six categories of expenses at a single level of detail—all of which we would today call subobjects. § 30.49(2), Fla. Stat. (1973).

The Sheriff's authority to make transfers at the subobject level is not at issue today. But in *Weitzenfeld*, it was, and in that context we decided that the county did not have the authority to determine the utilization of monies once allocated by the sheriff among those categories. 312 So. 2d at 195. It remains true that our statutes do not "authorize an intrusion into the functions which are necessarily within the purview of the office of sheriff." *Id.* at 196. But the Legislature, in a carefully composed statutory framework that we will not disturb, has provided additional specificity about what functions are within that purview, and what to do in the event that amendments may be in order.

---

In 2011, acting to further "local government accountability", the Legislature required sheriffs to further break down object-level spending to the subobject level, putting into place the framework we have considered in this case.

## III

We quash the First District's decision and hold that the Sheriff is not permitted under chapters 30 and 129, Florida Statutes, to make object-level transfers without the approval of the Alachua County Board of County Commissioners.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, MUÑIZ, and GROSSHANS, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal
  Class of Constitutional Officers/Direct Conflict of Decisions

  First District – Case No. 1D18-3367

  (Alachua County)

Sylvia H. Walbolt of Carlton Fields, P.A., Tampa, Florida, and James Parker-Flynn of Carlton Fields, P.A., Tallahassee, Florida; and Robert C. Swain, County Attorney, Alachua County, Gainesville, Florida,

  for Petitioner

Jacob Rush of Alachua County Sheriff's Office, Gainesville, Florida,

  for Respondent

Thomas W. Poulton of DeBevoise & Poulton, P.A, Winter Park, Florida,

for Amicus Curiae Florida Sheriffs Association

Laura Youmans of Florida Association of Counties, Tallahassee, Florida; and Alicia Lobeiras and Annika E. Ashton of Broward County Attorney's Office, Fort Lauderdale, Florida

for Amici Curiae Florida Association of Counties, Inc., Florida Association of County Attorneys, Inc., and Broward County, Florida